Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good afternoon this is Judge Wilson. I'm in Tampa. Judge Luck is in Tallahassee and Judge Rosenbaum is in Fort Lauderdale and we're here for oral case versus the Georgia Warden and Gerald Wesley King Jr. is here for the appellant case and Sabrina Graham is here for the state of Georgia and Mr. King are you ready to proceed with your argument? I am your honor. You may proceed. Good afternoon your honors. Gerald King of the Federal Defender Program in today on the first of our claims, the ineffective assistance of Mr. Pace's counsel at sentencing and the second and third which addressed the prosecution's misconduct during sentencing phase closing and counsel's ineffectiveness and failing to object to portions of that argument that were improper as a matter of state law. To address the ineffective assistance of counsel, first unrebutted and overwhelming DNA evidence matched Mr. Pace to each of the four counsels sent a psychologist Dr. Dennis Heron Dean to do a quote-unquote light or drive-by screening to see if they could present a guilt-based defense of intellectual disability. This screening indicated that Mr. Pace had organic brain damage and borderline intellectual functioning and the need to rule out bipolar disorder a major mental illness. Dr. Heron Dean recommended further testing and evaluation. Counsel said they would get back to Dr. Heron Dean. He obtained the full-scale testing that Dr. Heron Dean recommended they would have obtained as this court said in feral consistent unwavering and compelling and wholly unrebutted expert evidence that Mr. Pace suffered from significant permanent organic brain damage clear sub-average intellectual functioning of organic nature and paranoid schizophrenia. This is Judge Wilson counsel doesn't the record in this case reflect that Dr. Heron Dean advised Mr. Pace's counsel that he did not believe that a mental retardation claim would be viable and he did not think that that defense that mental incapacity defense was in his words promising and that his IQ score did not reflect intellectual disability and they took that in the consideration in making a strategic decision to go with a different penalty phase defense and why aren't we required to defer to the state courts finding on that don't we give the state court at the deference on that specific finding. Well your honor I think there are a few things going on there the evaluation of Mr. Pace was limited by counsel and all the members of the defense team testified to this to assess whether mental retardation was available as a guilt innocent phase defense and so Dr. Heron Dean performed a screening instrument that's very important Dr. Heron Dean's quote light unquote drive by screening is there to is just that it is a screening it is not a comprehensive test and the results of that were he estimated Mr. Pace's IQ at about 78 that's borderline intellectual functioning that itself by the way according to precedent of this court is mitigating evidence even if it did not amount to a guilt innocence phase defense and where we say that counsel's behavior was their conduct was unreasonable and where the state court erred in its adjudication otherwise is that no reasonable counsel is going to terminate their constitutionally required investigation into Mr. Pace's mental health at that juncture they are not going to ignore the red flags of organic brain damage intellectual disability and major mental illness which those screenings alerted them to now when we look at counsel's decisions about when to terminate an investigation we assess them for all of the circumstances in this case again we have overwhelming DNA evidence the unrebutted testimony at trial was that mr. pace was implicated in each of the four cases with a chance of a false positive being one in 500 million for three and one in a hundred and fifty million for the other so this is a case where and and to back up just slightly this is a case where counsel again the defense team is consistent on this testimony decided that a mitigating case a case presenting the kind of mitigation that dr. Aaron Dean screening alerted them to did not fit with their approach and their approach according to their so they have opted to forego an investigation into these areas of mitigation that again as this court said in Farrell are in compiling and assessing the Supreme Court precedent on this point is incredibly powerful mitigating evidence therefore going all of that in order to run a residual doubt defense premised upon these extremely large unlikelihood virtual impossibility that mr. pace has been wrongly identified as the perpetrator well this is judge Wilson again these lawyers are pretty experienced he had experienced lawyers and investigators who were working on this case who had experience with with capital cases and made a strategic decision but let's say that we accepted we accepted your argument that we should not give edpa deference to the Georgia courts findings on the on Strickland's performance pronged the facts in this case are pretty bad it's involved the murder of four elderly women and the facts are pretty grisly what can you tell us to convince us that the state courts finding on the prejudice prong of Strickland should not be given deference these are pretty bad facts they are your honor they are they are and they haven't and the evidence is though and the evidence is overwhelming these are I mean these are four grisly brutal murders and rapes of elderly women I think your biggest hurdle is to on the prejudice prong of Strickland that we should not defer to the state courts finding yes your honor apologies I just wanted to make sure that I didn't talk over you there no to speak to the state courts prejudiced determination well actually to address your point here what Supreme Court case law has taught Supreme Court cases and other cases in our brief identifying cases that are also extremely aggravated in which penalty phase relief was granted for failure to investigate and present the kind of compelling evidence that we have here most important fact I want to highlight for your honor is that the jury in mr. pace's case sent a note out asking if they had the power to sentence him with life without parole and as two justices and the Supreme Court of that death was not a foregone conclusion in this case and that despite the facts of this case death and the paucity of the penalty phase presentation which we've not yet discussed the jury was amenable to sentencing him to something other than death and so we can't assume they even as terrible as the facts of this case are we cannot assume that a death the mitigating evidence is here organic brain damage schizophrenia in borderline intellectual functioning all categories of evidence the Supreme Court in this court have recognized again and again as mitigating so yes that question by the jury that question by the jury supports a reasonable probability that the jury would have returned a life a recommendation of life instead of death I think it's easy to do well I think it speaks to the point that you brought up specifically your honor which is whether the evidence in this case was so aggravating is to push the possibility of a sentence of other than death out of reach and we know again from case law that that that that that is not the case and we know from the facts here that the jury was as the Supreme Court of Georgia said the dissenting judges in the Supreme Court of Georgia said pondering and ponderables and so the state says that that question by the jury could support the contention that the jury seriously consider alternatives to the death penalty and decided that the death penalty recommendation was their choice well your honor if that's the case that just argues again for counsel's ineffectiveness and the prejudice to mr. pace from not presenting this powerfully mitigating evidence that would have enhanced the case that the jury evidently responded to and I want to make this point this is very important trial counsel said that their penalty phase theory was residual doubt however at the penalty phase they instead pled mercy essentially had members of mr. pace's fam yes your honor this is Robin Rosenthal I want to go back to the mitigation question for just a moment if you don't mind I just want to make sure I understand your point I am understanding you to be arguing that when the initial Karen Dean evaluation was done it was done for purposes of prohibit execution of so-called mentally retarded individuals whether whether for guilt purposes or I guess you know capital punishment purposes whether mr. pace could be eligible for that particular defense in other words on the he wasn't eligible for the so-called mental retardation exception to capital punishment he also noted that there were some elevated factors and findings regarding schizophrenia and in particular delusions and hallucinations that he recommended that additional testing be done but that would have been for the separate phase of the penalty phase and it's a penalty phase there was no testing done at all and the testing that had previously been done related only to a determination of whether mr. pace would be eligible under the Georgia statute of being relieved from the possibility of a death sentence am I misunderstanding no your honor that's correct that's correct and dr. Heron Dean was dr. Heron Dean was directed to screen for mental retardation as the guilt innocence phase defense and as you said he administered a number of screening instruments I want to flag to the court that even the IQ testing here is just a screening it's a shibbly screening instrument where he estimates his IQ at about 78 he recommended further testing to counsel to explore the intellectual functioning that mr. mr. pace had he also administered as you said screenings that on many of the scales reflected unusual content the unusual responses indicating the presence of delusions and the computer generated scoring for this instrument actually said needs to be evaluated for bipolar disorder which is a major mental illness but at that point trial counsel walks away from the inquiry I have a couple of follow-up questions on that area there first as I understand that the the trial court the state habeas court did not find that there were any restrictive limitations on the mental health investigation in fact that the court there found as a matter of fact that the investigation was reasonable under the circumstances of the case isn't that that is what the state habeas court found correct your honor I don't think that's exactly right they say that the court I believe they say that counsel performed reasonably in issuing further investigation because it would contradict their residual doubt theory all right so and as I understand it there was some record I know you mentioned a few times about the testimony of counsel of trial counsel but trial counsel in fact testified that the purpose of the hiring dr. Henry Dean was to determine whether there were any red flags regarding possible mental health issues not just mental retardation is that correct no your honor I don't believe it is and all right I'm putting from members counsel I'm quoting from docket entry 17-1 pages 46 and 47 of the record quote this is summarizing dr. Hendon's role and why he was hired it was quote to determine whether or not there's any red flags that are raised with regard to possible mental health issues did counsel not testify to that I'm trying to get to the place in the record that you've indicated your honor and I might have to try to pull it up here and respond the testimony of the testimony of Mike Mears and Pam Leonard and Nancy Mao was that the screening was done for the purposes of ascertaining mental retardation but the focus of the case all along was reasonable doubt based on overzealous prosecution didn't count specifically state didn't counsel specifically state that it was to determine possible mental health issues and not mental retardation isn't that exactly what the testimony is and let me direct you while we're doing that to someplace else so as I understand it did you your honor I apologize could you give me that first site again I just want to make sure I will in a second it regards to as I understand it miss Leonard who is the one who largely dealt with the doctor she wrote up her conversation with the doctor as they were going through some of the evaluations and what she wrote was specifically quote I went to press Dennis Dennis being the doctor to take a measured approach to psychological testing by doing some initial screening then looking for correlation looking for correlates in the literature I use scores in certain tests often predicate scores to other tests for guidance as to what additional tests to administer he agreed fully with this approach and provided he had enough time and money to do so that in fact is in the record too is it not that is in the record and dr. Harington counsel it's not limited to mental retardation it's meant it was to psychological tests broadly right your honor I think that that is contradicted by other places in the testimony of without a doubt there are comments in the testimony my question is when given conflicts in the record isn't the state habeas court allowed to make findings about the reasonableness of a mental health investigation and the scope of that investigation being reasonable given the conflict your honor but your honor if there is a conflict as you've identified and what counsel said the purpose of these initial screenings was the scope of the original screenings there's no conflict that nothing else happened after that initial screening done by dr. Heron Dean well let's talk about that for a second council let's talk about that for a second because as I understand it the the additional screening that dr. Hendon wanted or additional testing was not related to schizophrenia at all but instead was related to frontal lobe issues in other words he wanted to further evaluate and confirm the the organic brain damage right nothing to do with with with schizophrenia at all is that correct I don't think that is correct your honor because and I'm we're not saying again that the screening indicated schizophrenia specifically we're saying that the screening showed elevations on a number of scales including mania including schizophrenia and that specific responses to those screenings indicated delusions and that the again there's no generator scoring of the PA although there's no I'm sure there's no doubt that's true my question is simply the additional testing that dr. Heron didn't Heron didn't wanted wasn't that related to frontal lobe damage related to the organic brain injuries right I your honor I'm sorry I don't think it it should be read that narrowly I don't I think that his line to miss Leonard is that he wanted to do full-scale testing to follow up on mental retardation and that the results of other testing indicated that further evaluation should be pursued and that the rule-out diagnoses generated by the PAI particularly were organicity and bipolar disorder right so I don't think there's I don't think there's anything from the record to suggest that dr. Heron Dean was not recommending an inquiry into mental health and indeed the results of these screenings point towards wave red flags for delusions and yes your honor I'd like to ask you a question you mentioned and I think the record is clear that the state court found that counsel had opted against doing additional testing in favor of proceeding on a residual doubt theory and I have to tell you I went through the entire closing argument yeah I did not see a single reference to residual doubt but I may have missed it no you aware of what the court was referring to in terms of what actually was presented for argument with respect to residual doubt no you want your honor you are absolutely correct there is nothing in the closing argument alluding to residual doubt except in fact an apology to the jury from counsel because mr. pace is some members of mr. pace's family said that they did they thought that he was innocent still despite the evidence presented during the guilt innocence phase what counsel did during the penalty phase closing was to say to the jury the case here is obviously very aggravated but what would imposing a sentence of death say about you and tried to work that angle so the actual penalty phase case despite counsel's protestations was a mercy case and really only that is there any support in the record for the state court's conclusion that counsel in fact proceeded with a residual doubt defense I'm outside of counsel's testimony claiming that that was their theory there is certainly nothing actually done to support it two minutes counsel counsel you have yes and your honors I'm I just want to flag that I have it I know I have two minutes left and I did want to address my claims two and three I'm happy to continue asking questions about claim one of course but if I could pivot the claim to quickly during the penalty pick yes I'm sorry I thought I heard a question the prosecutor's penalty face closing directed the jurors to come with him to each of the victims home in turn and imagine themselves experiencing what the victims had while luridly and graphically describing their rape and murder this was four separate and improper golden rule arguments two justices of the Supreme Court would have reversed despite counsel's failure to object he told the jury don't you get a little more this is judge Wilson again this these comments were made during the penalty phase rather than the guilt phase but haven't we said before in our opinions that you get a little prosecutors get a little more latitude during the penalty phase than the guilt phase and making these sorts of arguments which would include the golden rule argument and the other arguments that you mentioned in your brief well your honor I would say that the prosecutor here took more than a little latitude and these are arguments that tick off all the concerns articulated in Darden manipulating and misstating the Evans implicating his rights to remain silent there's nothing in some of these some of these some of these were not objected to and others the court gave curative the court gave curative instructions well if I can address actually the failure to object on claim three looking at my clock and seeing 20 seconds we'll give you a little more time we have argued all right well yes we've argued that trial counsel provided ineffective assistance for failing to object to these to these arguments that were clearly improper under Georgia law and because of his failure to object that misconduct was reviewed by a by a more stringent standard than they would have been had he objected in terms of whether they're in terms of the objections that counsel did make counsel did object to a number of the to a number of instances of misconduct I think it's worth noting that in one of the most egregious ones which is when the prosecutor uses the story of Jesus's crucifixion to comment on mr. pace's silence the court and counsel can't even think of what a curative instruction could be the court ultimately said that it was very close to the line but accepted the prosecutors I would say from the record frankly protectual claim that he was commenting not on mr. pace's exercise his right to silence the trial but that no members of his family had testified that he had expressed any kind of remorse so I think when you're dealing with a scope of misconduct here yes your honor I apologize for stopping I'm hearing some crackling and I wanted to make sure I wasn't talking over one of you I think when you look at the scope of the misconduct here it is far worse than Darden it's worse than Parker it kicks off all of the standards that this court has enumerated in Brooks where this is misleading and prejudicial it's not isolated it's extensive it's deliberate not accidental as evidenced by the prosecutor repeatedly doubling down on the misconduct once there has been an objection which judge Wilson goes to your point sometimes the objections just seem to spur the prosecutor to try even harder to prejudice the jury here so we would do that on their own dismiss this argument we've argued the prosecutorial misconduct merits sentencing phase relief on its own and the trial counsel's failure to object which resulted again in these claims being reviewed by a by a far more stringent standard is also ground for relief and seeing that I'm over my time unless I have another question on these issues I'll pop back up for rebuttal Thank You mr. King and I think you have reserved some time for rebuttal yes and we're we'll hear from the state miss Graham good afternoon may it please the court my name is Sabrina Graham and I am here on behalf of the warden asking that this court affirm the district courts denial of relief and I apologize for the creaking it's my chair I hope you can't that I'll start off with a ineffective assistance counsel claim regarding deficiency I think it's important and I don't I don't know how to say this any any more eloquently than this that mirrors now and Harvey or some of your most experienced death penalty litigators out there they're being accused of not having investigated whether or not mr. pace was abused neglected or had mental health disorders and that to me is like saying your most experienced neurosurgeon who goes in to do surgery doesn't bother to look for the tumor I'm sorry count sure this is Robin Rosenbaum I understand your point but even the most experienced among us make mistakes sometimes and I don't think we can decide the case based purely on the experience level of the individuals involved I think we have to look at the particular decisions they made in this case and let me tell you what I am concerned about here I am concerned that the entire mental health screening that was done was done in the context of determining whether mr. pace might be eligible for the Georgia exception to the death penalty under the so-called mental retardation exception and once it was determined that he wasn't eligible for that although dr. parenting found elevated levels of certain things in screening including delusions and hallucinations and suspected organic brain damage and told counsel this and even suggested following up and offered to do so no further steps were taken and with respect to the sentencing phase as opposed to with respect to the guilt phase as to whether or not he in fact had any such damage so that's that's my first concern my understanding when I read through the state court discussion of this is that the state court did not find it problematic in any case because it concluded that counsel had made an affirmative determination to proceed instead under a residual doubt theory under the sentencing phase and the problem is when I look at what counsel actually did it just does not line up with what counsel said he was doing there's not a single mention of residual doubt that I could find in the closing argument maybe you can find it and you can help me with that point me to where that would be that would be very helpful to me but in the absence of that it seems to me that there might be some unreasonable fact-finding here on the part of the state court in this regard and I wanted to give you an opportunity to respond to this. Sure, I'd like to lay out the record as I see it regarding trial counsel's decision regarding mental health screening I do think that it was a mental health screening about more than just mental retardation and I'd like to say that mental retardation could have been presented in the sentencing phase as well but here you had Dr. Heron Dean who gave an affidavit who said yes he did intelligence testing but he also did a screen and you have Mr. Mears testifying during his deposition that we would have done a mental health evaluation we would have looked for anything to see if there are any red flags for mental health issues he does not limit it to mental retardation and in fact Mr. Mears also testified that hey I would have talked to Dr. Heron Dean afterward I would have asked him about the evaluation and he says at one point that Heron Dean didn't turn up anything to change his approach in addition to all of that you also have the fact that trial counsel was in constant contact with Pace you have the fact that they did spend extensive time with the family members and friends you have them getting every kind of record they could on not only Pace but his mother and his father so they have a full picture here of what it was what his life was like and they chose even after Heron Dean said that they chose not to go forward with that I think that's a reasonable decision when you look at the totality of the circumstances in the totality of the record and I'm not saying that Mr. Mears shouldn't be found ineffective just because he's so experienced it just it doesn't make sense to me that he would not have gone forward in these things if he didn't see something there that I mean he gives you know lectures on this and so that doesn't make any sense to me well that's lots of times when we make mistakes they don't make sense whether they're here but I mean really I'm not trying to be flippant but let me ask you okay I'm sorry sorry no can you focus for a moment for me on the residual doubt issue here where can I find any kind of indication in the actual trial record itself that Mr. Mears and the defense here proceeded on a residual doubt theory at the sentencing phase I can point you to one thing he said in his closing argument during the sentencing phase but first I'd like to say that Mr. Mears said that their theory going into trial he when he testified at his deposition their theory going into trial was going to be residual doubt and they felt like they had a good reasonable doubt defense there to begin with because they felt first DNA evidence was new so they could point out his unreliable science and it didn't go in unrebutted as petitioner claims it actually was crosses the person the experts were cross-examined by Bruce Harvey at trial extensively in addition to that they also wanted to show prosecutorial aggressiveness they were overzealous and so mr. and they felt like they had other avenues there during the guilt innocence phase they could follow up on to show that he was not guilty however at the at the sentencing phase I'm sorry to interrupt it's just you know with these telephone things it's hard to take visual cues obviously so I apologize but with respect to the sentencing phase which is what we're concerned about here where can I find evidence that he actually engaged in a residual doubt defense and and that's what I was getting to I'm sorry I'm wrong winded he said none of it just didn't pan out in the guilt phase like they wanted it to the evidence did not pan out so they weren't left with this big reasonable doubt they thought they were going to be left with and so in trial counsel's mr. Mears is closing argument he says to the jury you know this is what he said he's just and this is on page 656 23 of his closing argument I'm sorry I don't have the federal site he says I think it would have been hypocritical for us to argue as we did and strongly and we have argued that the evidence didn't prove him not guilty you made that decision but how stupid would it have been to come in and say well you found him we have he is not guilty but we say he's crazy anyway so to me they're sort of trying to back off of that and say you know we said he's not guilty they're still not saying he's guilty but we're not going to try and put up in something and say this opposite of what's guilt that he's not guilty we do we have to look at the closing argument by defense counsel if we were to conclude that the penalty phase defense was not residual doubt but it was merely a mercy defense is there anything else in the state court record that would reflect that it that the defense was a residual doubt rather than a mercy defense I can't point you to anything particular in the sentencing phase and I just read it other than to say well this is Robert luck and I'm sorry to interrupt but I I think this goes to what judge Wilson is asking didn't in fact as I recount at least four or five of the witnesses at the at the at the penalty phase specifically state that they believed in the innocence of mr. pace and that he could not have done it based on their knowledge of him and their knowledge of him and their understanding the facts including some of his brothers and sisters who sat through the entire trial wasn't that wasn't that an evidence yes absolutely and they and they did testify to that I and counsel there's no reason to do that if you're not making a residual innocence a residual guilt defense a residual sorry residual doubt defense right I think that's fair yes and then one other thing is it is it not true that the jury instruction specifically call for the jury not just to consider in its penalty phase deliberations the testimony that's brought out in the in the penalty phase but in fact specifically says that they are to consider that testimony that was brought out in the in the guilt phase including those things that attack reasonable doubt correct yes yes concerning that because at first when I okay well there's a residual death but then when I looked at the actual closing argument it looks like counsel argues just the opposite because he says ignore that they said that of course they're going to of course they're going to say that they're his relative then you can't really hold it against pace that they still think he's innocent because there is relative so of course they're going to think the best of him so to me that is the exact opposite of arguing residual death maybe I missed something here but maybe you can tell me how that residual doubt argument I don't think it's a counter to the residual doubt argument I think that has something to do with what goes on at trial you have trial counsel standing there and he's looking at the jury and he sees their reactions and when Mr. Mears testified in state habeas he said that when the family testified that he didn't do it it came across as belligerent and perhaps he felt like he needed to shore that up with the jury and say and that's why he did it not because he wasn't saying there was no residual doubt there I think it was just a strategy that was born from you know looking at the jury and the trial you know Mr. Mears doesn't say that but that to me seems to be a logical conclusion there did I answer the question I mean I think you've answered it the best you can I don't I just personally I don't understand how arguing not to listen to what they said and not to hold it against his client when they said that they thought he was innocent support a theory of residual doubt but you know I don't know it doesn't seem to support me well even if this court were to find that counsel performed efficiently or that the state habeas court in fact their deficiency finding wasn't entitled to deference and you drop down to prejudice I don't think you can say that no reasonable jurors would have determined in this particular case there wasn't prejudice I mean let me ask you this about that and I will tell you when I first read through this record I mean it is a horrifying horrific record and so there is this initial gut reaction where you think to yourself well how could there be prejudice here you know the jury of course is going to reach this conclusion but I think there are two things that might suggest otherwise first of course is the note from the jury where they ask if they can if life imprisonment without parole is a possibility I mean that's not something that you frequently see in these death penalty cases I've worked on enough of them to know that I have not often seen that so that in and of itself to me suggests that the jury or at least some members of it we're having some doubts about whether they really wanted to impose the death penalty and second if in fact the mental health information had come in and specifically I'm talking about the fact that it seems pretty clear that this guy was suffering from delusions and hallucinations and schizophrenia at least as far back as 1995 which was at the time of the trial you know I think you know for those of us who have seen people who who suffer deeply with these kinds of problems you know I think that that might have had an effect on the jury in deciding whether it wanted to recommend execution or instead recommend life imprisonment and I think it's hard to be able to quantify exactly what effect that would have had so I don't know if you want to address those two things but I don't think we can say it's a done deal that there was no prejudice here when you look at the actual record well yes well first I would like to say that it's not about whether there's no prejudice it's about whether or not the state court reasonably determined that there was no prejudice and regarding your first issue of the note where they sent out does this really mean you know life without parole or whatever I've seen that in several of our death penalty cases and I think that's come up in a couple of cases before this court as well not not too long ago I'm happy to do a supplemental on that but certainly I've seen that that doesn't seem to be no you don't have to do a supplemental on that my point with that is simply that you don't see that all the time and I'm sure that you've seen it in other cases but doesn't mean that you see it in every case it's not the kind of question that you see in every single case and it's not the kind of question that appears in the majority of these types of cases I mean exactly how many it appears in is not really the point the point is that it's clear that the jury was at least thinking about that as an alternative well we don't know if they were thinking about that as an alternative or if they just generally wondered if you ever got out of prison if you have a life in it I mean there's no I mean that's what I'm signing a meeting to their question that's not there I'm sorry sorry yes why would you ask the question about whether life without parole was a permissible alternative if you intended to send it someone to death because it becomes completely irrelevant well I don't think it becomes completely irrelevant I mean they were there to determine whether or not he gets life or whether or not he gets death and maybe it was just you know something in the fancy in somebody's mind like hey well look does it really mean he's going to stay in prison that doesn't mean that they were seriously considering not giving him the death penalty I mean there's a little way to find the importance of it let me ask you something if you were the jury and you were going to decide death because this I mean I agree this is an absolutely heinous crime so if you were going to decide death on that basis then what would it matter to you whether a person who got life in prison could be paroled or not because you're deciding death so it's irrelevant and it makes no difference who cares if everybody else you know who's been sentenced to life imprisonment can get parole because pace can't if you're going to sentence them to death so it seems to me the only reason to ask the question is because you're seriously entertaining the possibility of sentencing him to life if you are under the impression that it will be without the possibility of parole and I would just respectfully disagree and say the jury could ask questions for any number of reasons we don't know exactly why they asked that particular question we're assigning a reason to it but that not may not be why they did and but to go on to the prejudice issue I would like to say even if you took this new information that he had and you put it up I think first of all you have a lot of credibility issues there you have a family telling as the state habeas court said one helpful comes with the rubber look I want to ask about that a little bit is it mitigating as a matter of law is it mitigating if I have a serious mental health issue seven years or six years after I commit the crime in other words does it tell the jury that I am that it mitigates the what I did and my eligibility for the death penalty if I have a psychological illness seven years after that crime happened and to the extent it is at all mitigating as a matter of law how weak or strong is that mitigating evidence okay no I do not think that is as a matter of law that it is mitigating for that particular crime for the crime that they have committed and I would but anything factor to be considered for this sentence and if it's not and you know maybe you're well right about this what is your authority for that position sure I think what I'm saying is it from what I understand judge luck is saying is saying you got a diagnosis seven years after trial that you have diagnosis they're not saying at the time of the crime you had schizophrenia so with that mitigate that particular crime no because your diagnosis came after but in and I and I assume what you're saying judge Rosemont is assumed that he could have gotten the schizophrenic diagnosis then based upon the evidence they presented in state habeas and would that have given a proven prejudice and I say absolutely not there either because first of all you have a credibility determination by the district court finding that it was not convinced that he in fact suffer from schizophrenia and that's a fact finding and a credibility finding secondly you have a whole host of issues that go into the credibility of the schizophrenia diagnosis first you have the family giving one narrative at trial and as the habeas court said giving another narrative in state habeas which means then that you have a credibility with your historians and the mental health experts evaluation and their of their historians here you have a big issue there secondly you have a you have a different diagnosis by the there at the prison regarding him third you have the fact that these mental health experts never once mentioned a crime they never want to talk about the facts of the crime they never talk about asking him about the facts of the crime how do we know what he was suffering from then you also have a person who was on drugs I'm not saying you can't be different and use drugs speaking of that the reason that we know he was on drugs at least in significant part and was using crack cocaine is because of the testimony of Jerry Johnson but the the defense team was unaware of the testimony of Jerry Johnson because they never talked to Jerry Johnson before or during the penalty phase of the of the trial so you know I mean I think that there are a whole lot of issues here plus by the way you know the state trial court made a lot of errors in saying what the evidence was it said for example that defense counsel was aware of Jerry Johnson and all of the was not true they said that mr. Shapiro psychologist or a psychiatrist when he was a statistician there are a number of these kinds of errors in the state court when it reached the conclusion that a proper mitigation investigation has been held I don't know if you want to speak to any of those but I want to bring them to your attention sure and I would say regarding I was talking about prejudice regarding the deficiency prong you have the CPC opinion by the Georgia Supreme Court and in the CPC opinion they specifically state and I will quote after independently reviewing the trial record and the habeas record we conclude that while the habeas court erred in some instances in considering the effect of counsel's alleged sentencing phase deficiencies on the jury's finding guilt rather than its selection of a sentence in determining whether the petitioner has shown the necessary prejudice to constitute ineffective assistance at the sentencing phase of trial the habeas court did not err in finding that Pace has failed to show that counsel sentencing phase performance in those instances was deficient under constitutional standards and there's no arguable merit to the petitioner's ineffective assistance of counsel claims so what I would say there is you have the Georgia Supreme Court doing its own independent review and then when we look at the Wilson versus Sellers it says although you look through a summary opinion that's just a presumption that the higher court is relying upon those particular findings and but that can be recorded well here we have the Georgia Supreme Court saying we're not looking we think the state court made some wrong findings there and but still we find he has it shown ineffective assistance of counsel so that's counsel as you noted earlier the investigation was seemed to be very thorough they they gathered every single document with Mr. Pace's name on it and his mother's name on it and his father's name on it and his family's name on it they talked to every single sibling they talked to family friends that were given to them by their they talked to Mr. Pace and asked him specifically about his background and experience they talked to his ex-girlfriend so clearly they were interested in relationships is there any indication that Mr. Johnson had a relationship with Mr. Pace that would have led them to believe that he had information that would have been mitigating or aggravating in any way no I could find nothing in the record showing that that trial counsel were told about Mr. Johnson I did find one note in the record where they where they were interviewing Mr. Pace and they asked him hey who was your roommate and he says oh I don't remember his name but he knows this other guy I knew him through this other guy so I don't even see where Pace told him about that and going back to Judge Rosenbaum's questions regarding the drug use he's been arrested for drug use and had to go in for drug screenings for that so we do know that he did use drugs and he did tell counsel that he used drugs so it wasn't that counsel didn't know that he used drugs it's that that they didn't know that he was doing crack every weekend with his Mr. Johnson so that's a different issue and back to the prejudice argument looking at the schizophrenia here it just to me I don't see how that mitigates what he did what he did was so volitional I mean he scoped out these ladies houses he broke into their houses he and one of them he sat on top of her while he took her shoe and took the shoestring out to strangle her with it I mean everything about his crimes show that he knew exactly what was going on when he broke in and he robbed the Barrett sisters he didn't act like he was in a few stater he didn't know what was going on he said to them hey when are your parents coming home what color is their car if you tell anybody I will I will hurt you I think he said to hurt you he may not have said to hurt you part he cut their phone lines so the stuff he did doesn't I just don't see an explanation from these mental health experts regarding how schizophrenia was affecting him regarding these particular crimes I'm not saying it's not mitigating evidence I'm just saying that it doesn't get a lot of weight and I don't think it's unreasonable for court not to give it a lot of weight and he broke into the home he actually the record reflects that there was evidence during the penalty phase that he broke into the home of Coretta Scott King and attempted to rape her and isn't that sort of prejudicial how did that seems clearly intended to inflame I did not I did not see that I know that he broke into a crack at Kings home but I didn't see and hear whether I didn't see any evidence suggesting that he attempted to rape her he said he saw her there was no there was no evidence that he attempted to rape her but the evidence at the sentencing hearing was that he broke into her home and they lifted fingerprints from her home correct they did it was a window they lifted the fingerprints from there and that was extensively litigated during the sentencing phase and he also pled guilty to the crime and the trial court they called in the trial court but defense counsel called in Mr. Purvis who was his counsel during the plea negotiations and he talked about what happened during the plea negotiations and the person who took the plea was actually former Justice Sears and they explained how they did that and she didn't find that counsel was ineffective so you have a plea and you have fingerprints there and I mean I could be wrong about that but my recollection of that evidence was that that Coretta Scott King was not home at the time but that the prosecutor suggested it was a good thing because otherwise she would have been raped as well but maybe I'm remembering that wrong that could be I don't remember there was so much stuff in there I remember him stating which his statements I don't think came in in the sentencing phase but he told them that she was sitting there she was in the bed she was reading and I do believe I mean somebody said that and I mean he said that and somebody at trial said that I just don't remember if it was in the part where they admitted the evidence or if it was in the part where they litigated whether the infinite information should come in or not but yes I mean he did say she was there okay I'm sorry I was just gonna say regardless of whatever count the district attorney may have said here in his closing arguments the trial court was very clear before counsel argued that whatever they said was not evidence and then afterwards they charged the court that whatever they said in their argument wasn't evidence regardless of that I think it's clear that the prosecutor here made several and regardless of whether it justifies in and of itself granting of the petition I made several inappropriate and really outrageous remarks and you know I would hope that in any case that the state of Georgia would instruct its prosecutors that this type of conduct is not appropriate I mean it really is offensive what he he did and said knowing full well that the Georgia Supreme Court is prohibited such types of statements for example the golden rule stuff but there is the ethnic rage cartoon I mean that the religious thing I said you know use that I mean there's just so much of it here the sodomy the sodomy remark about well you know he likes anal sodomy so put him in jail I mean it was outrageous and if for no other reason than just for appropriate instruction I hope that the Georgia Attorney General's office will instruct its prosecutors that this is not appropriate and it's not going to be tolerated oh certainly judge Rosenbaum if we ever speak at a prosecuting attorney counsel thing we always say look be very judicious in your statements during closing and opening closing argument opening statements and we're not I just would like to again drop back and say here we're looking at whether or not the state court the Georgia Supreme Court's decision was unreasonable under Supreme Court precedent and when you look at Darden and the purpose of the AEDPA it's a Darden is a very broad standard and they have a very high you have two minutes okay thank you minute count and they have a very high standard to come under there and whatever the prosecutor may have said it just really pales in comparison to the crimes in this problems I agree with judge Rosenbaum that the comments by the prosecutor were just outrageous and I guess my question is how do we disincentivize prosecutors if we don't grant writs of habeas corpus when they're when that when their behavior is outrageous even though the evidence in the case is overwhelming I mean if the evidence is overwhelming there's no there's no disincentive for a prosecutor to just have that with improper with improper comments during their closing argument because they know that the petition for writ of habeas corpus is going to be denied I don't know that they know that it's going to be denied and I don't think the purpose of the AEDPA is to determine whether or not we should disincentivize or I'm sorry I'm saying that wrong the prosecutors I think here is to determine whether or not the state court made a reasonable decision under Supreme Court precedent and in this particular case we would say that they did and part of that is because the facts of the crime are so aggravated and but well let me ask you let me ask you one more question before you conclude if I could go back to the note by the jury the jury asked about the possibility of life without parole what did the judge tell the jury the judge told the jury he gave them a proper instruction he informed them that they were not to consider that they were to assume that a life sentence meant a life sentence and I'm paraphrasing obviously but that's that's what the court said okay so he gave a proper charge there was no improper he gave a proper charge counsel didn't he this is Robert Luck didn't he say quote the trial judge said quote you shall not consider the question of parole your deliberations must be limited to whether this defendant shall be sentenced to death or whether he shall be sentenced to life in prison you shall assume that your sentence whichever it may be will be carried out under our law life imprisonment means that the defendant will be sentenced to incarceration for the remainder of his natural life he essentially told them that it is life in prison is life in prison right correct he did so if they were truly considering that particular sentence and he they were told he would be in prison for the rest of their life they still did not give him that they still chose the death penalty which is how we know that it didn't ultimately affect the decision it was just a question of curiosity correct yes so unless there any further questions I know I'm over time I would again just ask this court affirm the district courts denial of relief and thank you very much thank you miss Graham we'll hear from mr. King you've reserved some time for rebuttal yes your honor thank you just to start from the back I guess well mr. King this is and what I'm hung up on I'm hung up on on on prejudice and if the judge gave the jury an appropriate instruction don't we presume that the jury follows the judge's instruction sir I want to make as to what issue I apologize the jury asked the court about life about the possibility of life without parole and the court advised the jury if I understood miss Graham correctly that if he was sentenced to life he would spend the rest of his life in prison so obviously when the jury asked that question they just wanted to make sure that even if they did not recommend the death penalty that they recommended life imprisonment that this guy would never get out and the judge instructed them that and they still chose a recommendation of death and if that's the case I'm hard-pressed to determine how that note establishes that there would be a reasonable probability of a different outcome if counsel was not deficient in the penalty phase of this case well your honor I I think that that gets to the fifth of the issues that we that we had a certificate of appeal ability on and I not hello is that the only thing that establishes prejudice the jury's no sir is there anything no I don't know I don't think so I think that we can look at the nature of the mitigating evidence here that was unavailable and we can look at other cases in which there there was a great deal of aggravation but in which mitigating evidence of this type which again to refer your language and feral consistent on wavering unrebutted mental health evidence that is powerfully mitigating and even in cases perhaps where there was no jury note I don't concede that that was the meaning of the note and I know that two justices of the Supreme Court of Georgia interpreted it that way then we still can get to a place where death is not a foregone conclusion and I mean the Supreme Court in Andrus just last week said we have to be careful in doing these kinds of comparative where we look to precedent and say like here's where the bar is unless you think that the mitigation is above this bar relief is unavailable or the flip side of that I would argue that if a case is aggravated to a certain point what you have to do here is the prejudice analysis that the Supreme Court is laid out you take all of this mitigating evidence you but there was a deuce in the state habeas proceedings you add it to what was there in trial and occasionally that means subtracting evidence as was the case here where many aggravating aspects of the of counsel's presentation would have been negated by this evidence and I so I think prejudice here requires focusing on what this mental heaven what this mental health evidence the organic brain damage evidence the borderline intellectual functioning evidence said about mr. pace and to get to part of what was covered during when miss Graham was up there is testimony from dr. Dudley that at the time of the crimes he was in an acutely psychotic phase of schizophrenia and that that compromised his perceptions judgments and behaviors and that he is suffering from delusions that are almost the textbook definition of a schizophrenic brain and they're also the negative council this is Robert look what do we do with the negative credibility finding regarding dr. Dudley by the state habeas court your honor I'm not sure we can characterize that as a credibility finding dr. Dudley did not testify before this judge responded did not depose him or call him to testify I think what we have here is the judge discounting dr. Dudley's testimony in contravention of quarter based upon a concern about his methodology the failures who acknowledge the difficulty of a retrospective investigation that is not something required for the type of investigation that he was doing so I think actually we're not doing the credit it also doesn't also go to the inconsistency with some of the Department of Corrections records about the 2001 evaluation and finding delusions but not necessarily schizophrenia and also his original intake forms showing that he didn't have any of the symptoms of schizophrenia no your honor I think dr. dr. Dudley and dr. Nestor accounted for the 2001 diagnosis and I think it's worth noting that in 2001 mr. Pace is writing to the FBI in a Fulton County judge to say that his family is in danger of being kidnapped and tortured or killed at the prison in an attempt to extort money from him and other prisoners and he was diagnosed with it. Didn't the prison also note that he was talking to himself and hearing voices and things of that nature so those would be objective findings there are not subjective in any way isn't that right that's correct and also I think this is important dr. Dudley and dr. Nestor accounted for that diagnosis and explained why they believe that schizophrenia was a more percent was the more correct of the diagnoses the screening done by and but there's also there it's also erroneous to say as was said below that the ex that the prison doctor dr. Beauchamp said that his issues had resolved they said that mr. Pace continued to be delusional but refused treatment and the screening instrument which is performed by a council which is formed by a counselor and relies on self-reporting we would argue is just is incorrect and does not does not controvert or contradict that testimony of dr. Dudley and dr. Nestor which explicitly accounted for it and I oh my so much to cover to refer judge luck you asked me specific questions about two items in the record which I retrieved the the first the the first part that you were asking me to review is from mr. Mears is deposition I believe her sorry might actually be his testimony but he's testifying on 17 146 that it is a common practice in his opinion for counsel to have or should have a client evaluated determine whether or not there's any red flag I would submit that here it's clear from context he's speaking generally and not about this council evidence by the fact that the next sample he doesn't know that yes uncle look at the paragraph right above it I think I mentioned this in my or not we needed to pursue further mental health investigation in this case right yes your honor but if you look at his affidavit which is 14 to page 95 he says that the evaluation was not directed at determining this type of mental illness and that's a quote and I agree there is a conflict here in the testimony but there's no conflict in the record about what counsel did not do next which is the follow-up testing and evaluation the doctor it can't be said that the focus at least there's some evidence in the record that the focus was not exclusively on mental retardation as it went to guilt in assistance space correct that is a post hoc justification offered by counsel I would argue that the critical piece I was merely asking you some of what they do next counsel I was merely asking if there's some evidence in the record is there oh yes there's a conflict in evidence as to what in those documents that you say there's a conflict in mr. beers testimony as to the purpose of the screening not what they did next there's no dispute that they did not do the evaluation the dr. Aaron Dean recommended I apologize and I see I'm out of time if I could say quickly as to the penalty phase closing arguments judge Rosenbaum I regret to say the misconduct here has been tolerated by every court that has reviewed it and indeed unless this court were to horrific display like we saw in the penalty phase closing at this case as soon as he says mr. pace would enjoy prison because of anal sodomy we're not in court anymore there's none of the dignity and respect for these proceedings that well and says is required and so we would ask the court to reverse and grant habeas relief for mr. pace thank you all right thank you counsel thank you miss Graham thank you and that concludes the argument in this case court is adjourned